## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAKYA LITTLE,

       *Plaintiff*,

    v.

PAMELA BONDI,

       *Defendant.*[1]

No. 22-cv-1511 (DLF)

### MEMORANDUM OPINION

Makya Little brings this employment action against the United States Attorney General under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Before the Court is the government's Motion for Summary Judgment, Dkt. 28.  For the reasons that follow, the Court will grant the motion.

## I.    BACKGROUND[2]

### A.  Little's Employment Roles and the All Hands Event

Beginning in 2009, Little, an African American woman, was employed by the Federal Bureau of Investigation (FBI).  Def.'s Statement of Facts (SOF) ¶ 1, Dkt. 28-1.  She worked as a

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current United States Attorney General is substituted as the party defendant.  Fed. R. Civ. P. 25(d).

[2] Unless otherwise noted, the facts as described are not in dispute.  Little failed to comply with Local Civil Rule 7(h)(1) and the Court's Standard Order for Civil Cases, Dkt. 4, both of which required her to submit a statement of genuine disputed issues supported by citations to the record. Instead, she submitted her own statement of facts that did not identify the genuine issues in dispute. Even so, the Court must "determine for itself that there is no genuine dispute as to any material fact" by examining whether any of the defendant's statements are controverted by Little's "deficient" statement of genuine issues or the evidence.  *English v. Safeway, Inc.*, No. 22-cv-3607, 2023 WL 6846994, at *3 (D.D.C. Oct. 17, 2023) (citation modified).

Visual Information Specialist from 2009 to 2014, and as a Management and Program Analyst from 2014 to 2017.  Def.'s Ex. 1 (Little Resume), at 1–2, Dkt. 28-3.  She did not have any managerial responsibilities in those roles.  Def.'s SOF ¶ 9.

From January 2017 to January 2020, Little served on a joint duty assignment at the Central Intelligence Agency (CIA).  *Id.* ¶ 8.  The "Memorandum of Understanding" for her role stated that the position was the "[e]quiv[alent]" of a GS-15 position and required "manag[ing] two teams of 14 staff employees and contractors—including four direct reports."  Pl.'s Ex. 4 (JDA Mem. of Understanding), at FBI000735–36, Dkt. 30-1.  During her joint duty assignment, however, Little's official designation within the FBI remained that of a GS-14 analyst.  Pl.'s Ex. 5 (Pl.'s Little Dep. Tr.), at 28:1–10, Dkt. 30-1; *see* Def.'s Ex. 2 (Investigative Summary), at 3, Dkt. 28-4 ("Little stated . . . she was a GS-14 operating in a GS-15 position, without the GS-15 salary.").

On May 14, 2019, Little attended an "All Hands Event" for the FBI Counter-Terrorism Division.  Def.'s SOF ¶ 5; *see* Def.'s Ex. 4 (Little's First EEO Compl.), at FBI000050, Dkt. 28-6.  During the question-and-answer portion of the event, she asked the FBI Director "where diversity and inclusion had fallen in his priorities."  Def.'s SOF ¶ 6 (quoting Def.'s Ex. 3 (Def.'s Little Dep. Tr.), at 46:5–6, Dkt. 28-5).[3]

### B. Non-Selection for the Human Resources Position

On December 19, 2019, the FBI informed Little that she had not been selected for the position of Assistant Section Chief in the FBI's Human Resources Division (HR Position).  *Id.* ¶ 12.  During the application process, the hiring manager for the position, Peter Sursi, received

---

[3] In her summary judgment briefing, Little claims that she also "object[ed] to unlawful employment practices" that cause racial disparities.  Pl.'s SOF ¶ 5, Dkt. 30.  As phrased in her first administrative complaint, however, her objection consisted of "[bringing] attention to the lack of diversity within [Counter-Terrorism Division] leadership and within the Bureau."  Little's First EEO Compl. FBI000050.

comments from Little's first-line supervisor, Katherine Cole, stating that Little lacked the supervisory experience necessary for the HR Position. *See id.* ¶¶ 10, 13, 15–16; *see also* Def.'s Ex. 8 (Cole-Sursi Email Correspondence), at FBI000700, Dkt. 28-10. Little was not interviewed, Def.'s SOF ¶ 14, and Ivonne Johnson, a Hispanic woman, was ultimately hired for the position, *id.* ¶ 17. Prior to her selection, Johnson had served in "a variety of administrative and managerial roles." *Id.* ¶ 18.

### C. Non-Selection for the Counter-Terrorism Position

Also on December 19, 2019, Little was informed that she was not selected for the position of Unit Chief in the FBI's Counter-Terrorism Division (Counter-Terrorism Position). *Id.* ¶ 23. Cole served as the hiring manager for the Counter-Terrorism Position, and she and other FBI officials interviewed Little for the position. *Id.* ¶¶ 24–26. The FBI's stated reason for Little's non-selection was that Little lacked "front-line leadership experience." *Id.* ¶ 28; *see* Pl.'s Ex. 71, at FBI000192, Dkt. 30-7; Def.'s Ex. 12 (Cole Aff.), at 2–3, Dkt. 28-13; Def.'s Ex. 13 (Klionsky Aff.), at 3, Dkt. 28-14. Michael Caldwell, a Caucasian man, was hired for the position. Def.'s SOF ¶ 29. Caldwell had previously served in managerial roles at the FBI, including as a Unit Chief, and was a Staff Sergeant in the United States Marine Corps before joining the FBI. *Id.* ¶¶ 30, 32.

### D. Non-Selection for the National Security Position

On January 28, 2020, Little was informed that she was not selected for the position of Unit Chief in the FBI's National Security Branch (National Security Position). *Id.* ¶ 36. Little was interviewed for the position by the hiring manager, Douglas Larson, and other FBI officials. *Id.* ¶¶ 37–41. The FBI justified Little's non-selection by referencing her comparative lack of communications experience and poor interview performance. *See id.* ¶ 43; Pl.'s Ex. 72, at

3

FBI000584, Dkt. 30-7; *see also* Def.'s Ex. 15 (Larson Aff.), at 2–3, Dkt. 28-16 (noting Little's relative lack of communications experience); Def.'s Ex. 16 (Blowe-Wyche Aff.), at 2–3, Dkt. 28-17 (noting Little's comparatively poor interview performance).  Instead, the FBI hired Christina Fahim, a Caucasian woman.  Def.'s SOF ¶ 44.  Fahim had previously served as a Unit Chief in the FBI's Human Resources Division, where she managed multiple employees.  *Id.* ¶ 45.

### E.  First EEO Complaint

On March 2, 2020, Little filed her first administrative complaint of discrimination to the Equal Employment Opportunity (EEO) Office.  *Id.* ¶ 7; Little's First EEO Compl. FBI000037.[4]  In her complaint, Little alleged numerous claims of race-based discrimination and retaliation related to several instances of non-selection, including those recounted above.  *See* Little's First EEO Compl. FBI000050–54.  A. Tonya Odom, the then–Section Chief of the FBI's Office of Diversity and Inclusion, Def.'s SOF ¶ 11, was named as a Responsible Management Official in the complaint, *see* Def.'s Ex. 23 (Little Investigative Examination), at 10:12–18, Dkt. 28-24.

### F.  Non-Selection for the EEO Position

On April 19, 2021, Little was informed that she was not selected for the position of Section Chief in the FBI's Office of Diversity and Inclusion (EEO Position).  Def.'s SOF ¶ 49.  Little was interviewed by a panel that included Odom and Larissa Knapp, the FBI's Acting Associate Deputy Director.  *Id.* ¶¶ 50–52.  While Odom was aware of Little's EEO complaint because Little had named her as a Responsible Management Official, Odom did not disclose information about the

---

[4] Little's complaint contains conflicting allegations as to when she filed her first EEO complaint. *See, e.g.*, Compl. ¶ 13 (March 2, 2020), Dkt. 1; *id.* ¶ 35 (January 30, 2020); *id.* ¶ 137 (January 27, 2020).  In her summary judgment briefing, Little claims that she filed her first EEO complaint on January 27, 2020.  Pl.'s SOF ¶ 21.  In support of that claim, she points to an email that she sent to an EEO official on that date.  *Id.*  But the formal complaint that resulted from that correspondence is dated March 2, 2020.  Little's First EEO Compl. FBI000037.  As such, the Court considers March 2, 2020, to be the operative filing date.

complaint to the other members of the interview panel.  *See id.* ¶ 59; Def.'s Ex. 21 (Odom Investigative Examination), at 18:24–19:24, Dkt. 28-22.  Scott McMillion, an African American man, was hired for the position.  Def.'s SOF ¶ 54.  McMillion had been with the FBI since 1998 in a "variety of field and supervisory roles."  *Id.* ¶ 55.

### G.  Recission of the Bravo Consulting Group Job Offer

On August 18, 2021, Bravo Consulting Group (Bravo) rescinded a job offer that it had previously made to Little, *id.* ¶ 61, due to negative feedback about Little that it received from the CIA, where Little had served during her joint duty assignment, *id.* ¶ 63.  Although the origin of the negative feedback is in dispute, Little contends that it originated with Odom and was passed to Bravo by Sonya Holt, the former CIA Chief Diversity and Inclusion Officer.  *Id.* ¶ 62; *see* Pl.'s Mem. in Opp'n 33, Dkt. 30 ("[Little's] verbal offer from [Bravo] was rescinded after a negative reference vicariously provided by SC Odom.").  *But see* Def.'s SOF ¶¶ 63–65 (alleging that the Bravo recruiter who informed Little of the rescission had never heard of or spoken to Holt).  In particular, Little alleges that Odom told Holt that Little "went around her former employer."  Def.'s Little Dep. Tr. 82:19–20; *see also* Pl.'s Mem. in Opp'n 27 (alleging that Odom expressed to Little "her frustration with [Little] for 'going around' [Odom] to address the FBI's unlawful employment practices directly with [Odom's] superiors").  According to Little, this feedback "did not sit well" with the CIA, Def.'s Little Dep. Tr. 82:20–21, and Holt, in turn, communicated the negative feedback to Bravo, Pl.'s Mem. in Opp'n 33.

### H.  Second EEO Complaint and this Lawsuit

On August 4, 2021, Little filed a second EEO complaint, alleging discrimination related to her non-selection for the EEO position.  *See* Compl. ¶ 25.  After not receiving a final agency decision in either EEO case, Little filed a complaint in this Court against the Attorney General,

alleging causes of action for race-based discrimination, sex-based discrimination, retaliation, and hostile work environment in violation of Title VII. *See* Compl. ¶¶ 110–57.[5] The government filed a motion to dismiss in part or, alternatively, for partial summary judgment. *See* Def.'s Partial Mot. to Dismiss or for Partial Summ. J., Dkt. 10. The Court granted the motion, dismissing, *inter alia*, Little's hostile work environment claims. *See* Order, Dkt. 14; Mem. Op. 8–10, Dkt. 15. The government then moved for summary judgment on the remaining claims. *See* Def.'s Mot. for Summ. J., Dkt. 28. For the reasons that follow, the Court will grant the motion.

## II.    LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes*

---

[5] Little was counseled when she filed her complaint but now proceeds *pro se*. Although the Court will liberally construe Little's summary judgment briefing, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed." (citation modified)), it will treat Little's complaint as any other complaint "crafted and signed by a lawyer," *Bell v. District of Columbia*, No. 23-cv-2036, 2024 WL 2846770, at *4 (D.D.C. June 5, 2024) (citation modified).

*v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    ANALYSIS

### A. Discrimination Claims

Title VII bars employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex."  42 U.S.C. § 2000e-2(a)(1).  When a plaintiff alleging unlawful discrimination offers only indirect evidence of discrimination at summary judgment, the plaintiff's claims are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under that framework, the plaintiff has the burden of first establishing a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citation modified).  If "the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action in question."  *Id.* (citation modified).  "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* (citation modified); *see McDonnell Douglas*, 411 U.S. at 804–05.

If, on a motion for summary judgment, the employer carries its burden to provide evidence of a legitimate, nondiscriminatory reason for the challenged action, the Court "need not—and

should not—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted).  Instead, the Court "must conduct one central inquiry": "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for its action] and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019) (citation modified).  The Court "consider[s] this question in light of the total circumstances of the case, asking whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer." *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (citation modified).

### 1. Job Offer Revocation

Little claims that the FBI discriminated against her on the basis of race and sex by causing Bravo to rescind her job offer due to negative feedback from the CIA.  *See* Compl. ¶¶ 52–57, 112, 125.  In particular, Little maintains that FBI-employee Odom provided a negative job reference to CIA-employee Holt, and that Holt, in turn, communicated the feedback to Bravo, causing Bravo to rescind Little's job offer.  Pl.'s Mem. in Opp'n 33; *see* Compl. ¶¶ 52–57.

Because the government has not attempted to offer a legitimate, nondiscriminatory reason for the negative job reference, *see* Def.'s Mem. in Supp. of Mot. for Summ. J. 8, Dkt. 28-2 (arguing that Little has not shown that Bravo's job revocation was caused by Odom's negative job reference to Holt), the Court must determine whether Little "actually made out a prima facie case," *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (citation modified).  She has not.

Even assuming that Little sufficiently identified an adverse employment action, she has not offered evidence that would raise an inference of unlawful discrimination.  During her deposition testimony, Little stated that Odom told Holt that Little "went around her former employer."  Def.'s Little Dep. Tr. 82:19–20.  She further testified that this feedback "did not sit well" with the CIA, *id.* at 82:20–21, and that Holt, in turn, communicated the negative feedback to Bravo, *see id.* at 82:3–83:6; *see also* Pl.'s Mem. in Opp'n 33.  Likewise, in her summary judgment briefing, Little alleges that Odom expressed to Little "her frustration with [Little] for 'going around' [Odom] to address the FBI's unlawful employment practices directly with [Odom's] superiors."  *Id.* at 27.

Drawing all inferences in Little's favor, Little's own evidence suggests that Odom gave the negative reference either (1) in response to frustration with Little's efforts to bypass Odom to further diversity initiatives; or (2) out of personal animus toward Little.  Dissatisfaction with an employee's performance, however, is a nondiscriminatory reason for giving a negative job review that does not, on its own, raise an inference of any unlawful discriminatory animus.  *See Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997); *Hogan v. Hayden*, 406 F. Supp. 3d 32, 44 (D.D.C. 2019) ("Insubordination is a commonly asserted, legitimate, non-discriminatory reason for taking an adverse employment action." (citation modified)).  And personal animus is not alone sufficient to establish discrimination on the basis of race or sex.  *See Prince v. Rice*, 570 F. Supp. 2d 123, 134–35 (D.D.C. 2008).  As such, Little "shoots herself in the foot by showing that the real explanation for the employer's behavior is not discrimination, but some other motivation." *Thompson v. McDonald*, 169 F. Supp. 3d 170, 185 (D.D.C. 2016) (citation modified).  Little's conclusory statements regarding discriminatory motive are insufficient to defeat the government's motion for summary judgment.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

In her opposition to the government's motion for summary judgment, Little alleges for the first time a "cat's paw" theory of discrimination, arguing that Odom was not acting on her own discriminatory motive but rather on orders from supervisors who harbored discriminatory animus. *See* Pl.'s Mem. in Opp'n 27–34.  In support of this argument, Little points to a statement in which Odom "describe[d] her [*i.e.*, Odom's)] role as a 'soldier'" who "execute[s]" orders from her "commanders," *id.* at 28, and to Odom's interactions with other government employees, *see id.* at 28–34.

This argument is both forfeited and meritless.  To start, Little did not raise any cat's paw theory in her complaint, and the Court is disinclined to permit her to shift her theory of liability at the summary judgment stage.  *Cf. Ball v. George Wash. Univ.*, No. 17-cv-507, 2019 WL 1453358, at *14 (D.D.C. Mar. 31, 2019) ("[A]llowing an employee to shift theories of liability in response to a dispositive motion forces the employer to respond to a moving target, devoting significant resources to discovery and briefing only to have the issues shift at the last second.").  In any event, Little's cat's paw theory cannot survive summary judgment.  "To prevail on a 'cat's paw' theory, the plaintiff must show that (1) the direct supervisor performed an act motivated by discriminatory animus (2) that was intended by the direct supervisor to cause an adverse employment action, and (3) that act was a proximate cause of the ultimate employment action."  *Savignac v. Day*, 754 F. Supp. 3d 135, 166 (D.D.C. 2024) (citation modified); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 & n.1 (D.C. Cir. 2015); *cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 421–22 (2011) (finding similar in the context of the Uniformed Services Employment and Reemployment Rights Act).  Here, Little alleges that Odom's supervisors were "bias[ed]" toward Little and that Odom "developed a pattern of sharing negative false employment information about [Little] with [intelligence community] hiring managers and FBI employees."  Pl.'s Mem. in Opp'n 29; *see id.*

at 27–34.  But Little does not point to any specific acts by Odom's supervisors that relate to the negative employment reference ultimately conveyed to Bravo.  *Contrast, e.g.*, *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016) (Title VII plaintiff "introduced enough evidence for a reasonable jury to find that (1) [the supervisor] was motivated by racial animus when she recommended [the plaintiff's] suspension, (2) the recommendation was intended to cause the suspension, and (3) the recommendation was a proximate cause of [the] ultimate decision").  Absent a showing that Odom's supervisors "performed an act motivated by discriminatory animus," *Savignac*, 754 F. Supp. 3d at 166 (citation modified), Little's cat's paw theory fails, *cf. Kilby-Robb v. Devos*, 246 F. Supp. 3d 182, 201 (D.D.C. 2017) ("[The plaintiff's] 'cat's paw' theory must fail.  [The plaintiff] has identified no discriminatory or retaliatory act by [the supervisors] that has any causal link to her 2011 nonselection.").

The Court will thus grant summary judgment as to Little's discrimination claim regarding her Bravo job revocation.

### 2.    Non-Selections

Little also claims that the FBI discriminated against her on the basis of race and sex with respect to her non-selections for the Human Resources, Counter-Terrorism, National Security, and EEO positions.  *See* Compl. ¶¶ 112, 125.  As to each of these positions, the FBI contends that Little was not selected because "she lacked the requisite qualifications, especially in comparison to the other candidates."  Def.'s Mem. in Supp. of Mot. for Summ. J. 3.  Because the government has identified legitimate, nondiscriminatory reasons for these non-selections, the decisive question is whether "a reasonable jury could conclude from all of the evidence that the adverse employment decision[s]" were "made for a discriminatory reason."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

Little has failed to carry her burden on these claims.  While Little offers some evidence to rebut the government's proffered nondiscriminatory reasons, that evidence is insufficient to show that those reasons are pretextual.

### i.    Statistics

Little provides two exhibits showing the racial demographics of FBI employees and their promotion rates.  *See* Pl.'s Ex. 50, Dkt. 30-5; Pl.'s Ex. 54, Dkt. 30-5.  According to Little, these exhibits demonstrate "an egregious level of disparate impact of the FBI's promotion practices, policies, and processes on African American, female, and African American plus female FBI employees for decades."  Pl.'s Mem. in Opp'n 14; *see id.* at 11–15.  She argues that the exhibits establish an inference of discrimination by showing that the FBI's proffered reasons for the non-selections were "clearly pretextual."  *Id.* at 14.

While "[s]tatistical evidence may be used to . . . show that the employer's stated reasons for the challenged actions are a pretext for discrimination," *Warner v. Vance–Cooks*, 956 F. Supp. 2d 129, 159 (D.D.C. 2013); *see Cook v. Boorstin*, 763 F.2d 1462, 1468 (D.C. Cir. 1985), evidence of a statistical disparity is "ordinarily not dispositive" in a disparate *treatment* discrimination claim, *Warner*, 956 F. Supp. 2d at 159 (citation modified).[6]  To show pretext for such a claim, the plaintiff "must compare the number of minorities hired with the number of minority applicants that were qualified for the position."  *Bolden v. Clinton*, 847 F. Supp. 2d 28, 35 (D.D.C 2012).  A "mere description of the composition of a workforce," standing alone, "does not support an inference of discrimination."  *Id.*

---

[6] Though Little argues that her data proves disparate impact, she did not allege any disparate impact claims in her complaint.  Rather, she raised only disparate *treatment* claims concerning whether the FBI's non-selections were the result of intentional discrimination.  "For that purpose, demographics alone are insufficient."  *Johnson v. Hartogensis*, No. 19-cv-1998, 2023 WL 6479495, at *8 (D.D.C. Oct. 5, 2023) (collecting cases).

Here, Little provides only a "general description of the [racial] make-up across [the FBI]." *Warner*, 956 F. Supp. 2d at 159. She has not offered any specific statistical data about the positions for which she applied, nor about the relative qualifications of the FBI's workforce from the aggregate data. *See generally* Pl.'s Ex. 50; Pl.'s Ex. 54. "Absent more precision," Little's statistics are not sufficient "to support an inference of discrimination" or to show that the FBI's "relative-qualifications reason[s]" are pretextual. *Warner*, 956 F. Supp. 2d at 159.

### ii.    Superior Qualifications

Little next attempts to establish pretext by arguing that she held "superior" qualifications than those ultimately selected for the desired positions. *See* Pl.'s Mem. in Opp'n 15–27.

Because "courts do not serve as a super-personnel department that reexamines an entity's business decisions, rebutting an employer's qualifications-based explanation often proves a difficult task." *Almutairi v. Int'l Broad. Bureau*, 928 F. Supp. 2d 219, 233–34 (D.D.C. 2013) (citation modified). "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). "In cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, [the court] must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998). As such, the plaintiff must show that "a reasonable employer would have found the plaintiff *significantly* better qualified for the job but nevertheless failed to offer the position to her." *Holcomb*, 433 F.3d at 897. At the same time, however, "a plaintiff attacking a qualifications-based explanation is expressly *not* limited to comparing her qualifications against those of the successful applicant," and may instead "seek to

expose other flaws in the employer's explanation, including, *inter alia*, showing the employer has misstated her qualifications." *Id.*

Little has neither shown that she was significantly better qualified than those candidates selected for the Human Resources, National Security, EEO, or Counter-Terrorism Positions nor "expose[d] other flaws" in the government's non-selection rationale that would support an inference of discrimination. *Id.*

### a. Human Resources Position

The government maintains that Little was not selected for the Human Resources Position "because of her lack of field experience and because of supervisory comments—provided by Cole—advising that [she] needed to acquire more 'front line leadership' experience before she could be deemed sufficiently qualified." Def.'s SOF ¶ 15.

The record supports that reasoning. Johnson, the candidate ultimately selected for the Human Resources Position, "initially obtained first-level supervisory experience in an acting capacity in 2006." Pl.'s Mem. in Opp'n 18. Little, in comparison, did not occupy any sort of supervisory role until she undertook her joint duty assignment at the CIA in 2017. Little Resume 1; Def.'s Little Dep. Tr. 21:10–25:6 (admitting that Little's previous jobs did not involve any supervisory functions). And, according to Little's first-line supervisor, Little's position at the CIA as a GS-15 program manager—"as defined in her joint duty Memorandum of Understanding"— "did not involve day-to-day front line supervisory tasks." Pl.'s Ex. 6 (Cole Dep. Tr.), at 54:17– 22, Dkt. 30-1. Little's work history thus supports the FBI's representation that Little had less supervisory experience than Johnson. *Contrast, e.g., Aka*, 156 F.3d at 1296 (finding a significant difference between 19 years of work experience and two months of volunteer experience).

Little's objections are unavailing.  Little first notes that she ranked 0.07 points higher than Johnson in her overall candidate score.  Pl.'s Mem. in Opp'n 18.  But a disparity of such a small magnitude does not show a "stark superiority of credentials" from which the Court may infer pretext.  *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (citation modified); *see Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) ("The qualifications gap must be great enough to be inherently indicative of discrimination." (citation modified)).  Little further points out that Johnson "ha[d] no recruitment or communications experience," both of which the job description required.  Pl.'s Mem. in Opp'n 18.  "Reasonable employers," however, "do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions." *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) (citation modified).  Nor are they "rigidly bound" by the language thereof.  *Id.* (citation modified).  And while Little argues that the hiring committee favored Johnson over the other candidates by "manufactur[ing]" criteria that favored Johnson, Pl.'s Mem. in Opp'n 19, Little has not asserted any facts to support an inference that such favoritism was the product of unlawful discriminatory motive, *see Kilby-Robb*, 246 F. Supp. 3d at 198 ("[F]avoritism based on criteria other than race, color, age, or other protected characteristics does not violate the federal anti-discrimination laws and does not raise an inference of discrimination." (citation modified)).

Finally, Little argues that the hiring committee exhibited bias by ignoring negative comments from Johnson's supervisor while overvaluing those from Little's.  Pl.'s Mem. in Opp'n 19.  But even assuming that Little alleges discriminatory—rather than personal—bias, there is no basis upon which a reasonable jury could conclude that the supervisors' comments suggest that the government's non-selection justification was pretextual.  *See McDonnell Douglas*, 411 U.S. at 805.

To start, Little takes Johnson's supervisor's comments out of context. While Little notes that Johnson's supervisor stated that Johnson's "style of communications ha[d] not been as effective as it could be" and that there had been an "ongoing issue" related to the fact that Johnson's "attempts to change things were not embraced by all," Pl.'s Mem. in Opp'n 19 (citation modified), she omits the supervisor's corresponding praise, *see, e.g.*, Pl.'s Ex. 70, at FBI000321, Dkt. 30-6 ("[Johnson] encountered obstacles to her attempts to improve functions from personnel invested in the old way of doing things. Through patience and persistence, AO Johnson was largely successful.").

At the same time, Little's characterization of her own supervisor's comments is meaningfully skewed. Little points to email correspondence between Cole and Sursi to argue that Cole "shar[ed] false negative employment information" with Sursi, causing Little "to be unfairly evaluated and rejected." Pl.'s Mem. in Opp'n 19. But Little does not identify the precise comments she believes to be false, and the record reflects that Cole's comments to Sursi included both positive and negative feedback. For example, Cole noted that Little "ha[d] taken great initiative" and that her "passion would be an asset to [the Human Resources Department]," while also acknowledging that Little "lack[ed] formal front line leadership experience." Cole-Sursi Email Correspondence FBI000700. Based on this feedback, Cole conveyed that Little would "fit" into a role that was "more big picture/strategic," but stated that, if Sursi "need[ed] someone to corral [Unit Chiefs] and Supervisors," she "recommend[ed] a candidate with more front line leadership experience." *Id.* Sursi agreed with that analysis, noting that it aligned with his "first take on things as well, looking at [Little's] resume." *Id.* Nothing about those comments is indicative of discrimination or pretext—rather, Cole and Sursi's correspondence regarding Little's qualifications supports the FBI's legitimate non-selection rationale.

It is not the Court's role to "second-guess how an employer weighs particular factors in the hiring decision." *Jackson*, 496 F.3d at 709.  Looking at the record as a whole, Little has not identified any flaws in the government's non-selection rationale that would support an inference of discrimination.

### b.  National Security Position

The government asserts that Little was not selected for the National Security Position "because of her relative lack of communication and other pertinent skills, along with her poor performance during the interview."  Def.'s SOF ¶ 43.  The FBI instead selected Fahim, a Caucasian woman, whom the FBI determined was better qualified.  *See* Def.'s Ex. 17 (Stevenson Aff.), at 3, Dkt. 28-18 ("The decision to rank Fahim as the number one candidate was unanimous.  Little was not the first or second most qualified.").

Little first argues that she was more qualified than Fahim because she ranked higher on her overall candidate score by 0.22 points, had prior communications experience, and had joint duty assignment credit that Fahim lacked.  *See* Pl.'s Mem. in Opp'n 22–23.[7]  None of these alleged discrepancies, however, is "great enough to be inherently indicative of discrimination."  *Jackson*, 496 F.3d at 707 (citation modified).  Indeed, Little does not address the fact that Fahim had "more analytic experience and interaction with the law enforcement . . . and intelligence communities," as well as with "internal stakeholders."  Stevenson Aff. 3.  In particular, Fahim had collaborated with a wide range of departments, *see* Pl.'s Ex. 72, at FBI000619 (noting Fahim's collaboration with "TD, LDP, CTD & CD as well as [the] NSA"), and had a background in national security that Little lacked, *see id.* at FBI000584.  On this record, Little has not established that she was

---

[7] Although Little argues that the National Security Branch requires joint duty assignment credit for its executives, Pl.'s Mem. in Opp'n 23, the job posting for the National Security Position did not identify any such requirement, *see* Pl.'s Ex. 72, at FBI000570–71.

significantly more qualified for the National Security Position. *See Holcomb*, 433 F.3d at 897; *see also Adeyemi*, 525 F.3d at 1227 ("In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." (citation modified)).

Nor is there any other evidence that would support the inference that the FBI's assertion that Little performed poorly in her interview was pretextual. True, a candidate's poor performance during an interview generally indicates reliance on "subjective considerations," which are to be treated with "caution on summary judgment." *Hamilton v. Geithner*, 666 F.3d 1344, 1356–57 (D.C. Cir. 2012). Here, however, the interviewers pointed to "concrete examples of poor answers" that "grounded their subjective assessment in more objective facts." *Id.* at 1356; *see, e.g.*, Pl.'s Ex. 72, at FBI000584 ("[Little's] question, 'since I will be working for you, tell me about your leadership style' was more of a demand than a question."). One interviewer recounted that Little was weaker in "explain[ing] strategy," while another "mentioned that Little took credit for work that he did in his prior position in the Human Resources Division." Stevenson Aff. 3. Such assessments do not reflect the sort of "vague and subjective" reasoning that may give rise to an inference of pretext. *Hamilton*, 666 F.3d at 1357.

Little resists this conclusion, arguing that the interviewers were "biased" against her because one of the panelists "accused [Little] of taking credit for work [she] did not do." Pl.'s Mem. in Opp'n 23. But while Little disputes the veracity of that allegation, *see id.* at 23–24, she does not allege any facts that suggest that the allegation was motivated by discriminatory animus

based on her race or sex, *see Adeyemi*, 525 F.3d at 1229 (plaintiff must "presen[t] specific evidence suggesting the decision maker harbors discriminatory animus" (citation modified)).[8]

Little has thus failed to produce sufficient evidence for a reasonable jury to conclude that the government's asserted non-selection justification was pretextual.  *See Iyoha*, 927 F.3d at 566.

### c.  EEO Position

The government asserts that the FBI hired McMillion—an African-American male—for the EEO position because he was comparatively more qualified "in relevant areas."  Def.'s Mem. in Supp. of Mot. for Summ. J. 3, 7.

Little's evidence once again fails to establish that this justification was pretextual.  Little argues that McMillion was not qualified for the EEO Position because he "was neither a certified DEI practitioner nor a DEI subject matter expert" and did not "possess any leadership experience in a DEI office within the [intelligence community]."  Pl.'s Mem. in Opp'n 24; *see id.* at 24–25. But Little overlooks the fact that McMillion had served as Chair of the Black Affairs Diversity Committee since 2018 and had, in that role, worked closely with the Office of Diversity and Inclusion on projects like the "Diversity & Inclusion (D&I) Interview Questions Project."  Def.'s Ex. 22 (McMillion Application), at 553, Dkt. 28-23; *see id.* at 549.  He had also served as a Unit Chief in the Human Resources, Criminal Investigative, and Cyber Divisions; as an Acting Assistant Section Chief for the Cyber Strategic Outreach and Initiatives Section; as an Aspiring Leader Mentor; and as an instructor for diversity trainings for the Office of Diversity and Inclusion.

---

[8] Although Little alleges that the panelist's accusations "aligned with the false accusations being spread throughout the FBI by [Odom]," Pl.'s Mem. in Opp'n 23, she does not assert that there was any relationship between those allegations and Odom's allegedly false statements regarding Little's resume.  As such, to the extent that Little accuses Odom of harboring discriminatory motive, *but see* Pl.'s Mem. in Opp'n 26–29, she has not alleged a connection between that motive and the panelist's allegations.

*Id.* at 549–52.  Taken as a whole, the record evidence does not suggest that Little's qualifications were sufficiently superior to McMillion's to support an inference of discrimination, *see Adeyemi*, 525 F.3d at 1227–28; *Porter*, 606 F.3d at 816, and Little has not pointed to any other evidence that might give rise to such an inference.[9]

### d.  Counter-Terrorism Position

Finally, the government argues that Little was not selected for the Counter-Terrorism Position "because of her lack of front-line leadership experience."  Def.'s SOF ¶ 28; Pl.'s Ex. 71, at FBI000192.  The hiring committee instead selected Caldwell, a Caucasian male, on the basis that Caldwell had "already served in a GS-15 Unit Chief role," Pl.'s Ex. 71, at FBI000190, "demonstrated leadership abilities throughout all the examples provided during the interview process," and "was more suitable for the position based on skills and experience," Klionsky Aff. 3.  The hiring committee's notes concluded that Little "should consider a Supervisory GS-14 position to be come [*sic*] more competitive for GS-15 positions."  Pl.'s Ex. 71, at FBI000192.

Little challenges the FBI's asserted justification as pretextual, asserting that she had front-line leadership experience and had already served in a GS-15 role.  *See* Pl.'s Mem. in Opp'n 20–21.  In particular, Little has proffered evidence that, for over three years, she functioned in a GS-15 supervisory role in her joint-duty position at the CIA, even if her official designation remained a GS-14.  *See* JDA Mem. of Understanding FBI000735–36; Pl.'s Little Dep. Tr. 28:1–10.  Furthermore, the memorandum of understanding describing the joint-duty position suggests

---

[9] Little further challenges Odom's "attempts to justify her refusal to recuse herself from serving on the interview selection panel after being named in [Little's] 2020 EEO complaint as the [Responsible Management Official]," arguing that Odom "intended to hide her retaliatory motivation."  Pl.'s Mem. in Opp'n 25.  That argument sounds in retaliation, not discrimination.

that Little would have managed two teams of "14 staff, employees, and contractors" in that role. Cole Dep. Tr. 119:2–4; *see id.* at 116:2–119:6.

Neither alleged misstatement, however, "approaches the level of adequate evidence" necessary to permit a reasonable jury to infer discrimination. *Holcomb*, 433 F.3d at 899 (citation modified). While the D.C. Circuit has "posited" that "a rather explicit misstatement . . . might permit an inference of discrimination," *id.*; *see, e.g.*, *Aka*, 156 F.3d at 1295 ("Thus, if the employer says that it did not hire the plaintiff because he did not speak Portuguese, the plaintiff can show that he *did* speak Portuguese, and that the employer knew it."), Little has not pointed to any explicit misstatement in the record.

First, even if Little had served in the functional equivalent of a GS-15 supervisory role, that fact does not render false the hiring committee's suggestion that Little "consider a Supervisory GS-14 position to be come [*sic*] more competitive for GS-15 positions." Pl.'s Ex. 71, at FBI000192. After all, an already qualified candidate can become more competitive by pursuing further relevant experience.

Similarly, the hiring committee's statement that Little "lack[ed] formal front-line leader experience," Pl.'s Ex. 71, at FBI000192, does not amount to the type of "explicit misstatement" sufficient to rebut the government's proffered nondiscriminatory explanation, *Holcomb*, 433 F.3d at 899. To start, the statement appears to be a comparative one measuring Little's leadership experience against that of other candidates. *See* Pl.'s Ex. 71, at FBI000192 ("Ms. Little is not being ranked for the [Counter-Terrorism] position due to the lack of formal front-line leader experience. Other candidates for this position have extensive front-line leader experience which led them to be ranked higher in the final position selection."). Furthermore, the fact that Little had some supervisory experience does not mean that she had the type of "front-line" leadership

experience for which the hiring committee was looking.  *See* Cole Dep. Tr. 77:6–10 ("To my knowledge, while Ms. Little was on joint duty, she did not have—she was not front line supervising any employees but may have been supporting employees in a leadership capacity as a second-, third-, and fourth-level leader.").  Indeed, Little herself appears to acknowledge that she and Caldwell exercised different degrees of leadership authority.  *See* Pl.'s Mem. in Opp'n 21 (describing Caldwell's assignment as involving "first-level supervisory capacity" and Little's as involving "supervisory experience at the fourth-level").  On this record, the hiring committee's statement that Little "lack[ed] formal front-line leader experience," Pl.'s Ex. 71, at FBI000192, does not amount to the type of "explicit misstatement" sufficient to rebut the government's proffered nondiscriminatory explanation, *Holcomb*, 433 F.3d at 899.

Little further argues that Caldwell "violated the assessment process by asking a previous supervisor . . . to overwrite the scores and feedback of his current supervisor" to "replac[e] his feedback and ratings with perfect scores."  Pl.'s Mem. in Opp'n 20.  Though Little points to evidence showing that Caldwell's former supervisor provided two rounds of feedback, *see id.* at 20–21 (citing Pl.'s Ex. 71, at FBI000208–11), she offers no evidence that the additional feedback was against any stated policy or an act of intentional manipulation, *see Johnson v. Wash. Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 222 (D.D.C. 2018); *see also Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006) (Brown, J., concurring in part and dissenting in part) ("When a plaintiff relies entirely on his own self-serving testimony, which lacks any corroboration and is contradicted by all the available . . . evidence, a court is not obligated to reward the plaintiff with a jury trial.").  And even assuming that Little could support such allegations, she has not offered evidence to suggest that the "FBI's allowance of Mr. Caldwell to circumvent the [Candidate Score Summary] score qualification process," Pl.'s Mem. in Opp'n 22, was based on any unlawful

discriminatory motive against her as opposed to mere favoritism toward Caldwell, *see Kilby-Robb*, 246 F. Supp. 3d at 198.

Finally, Little argues in passing that she was better qualified for the Counter-Terrorism position in light of her higher overall candidate scores and greater experience in supervisory roles. *See* Pl.'s Mem. in Opp'n 20–21.  These arguments, too, fall short.  Though Little was ranked first in overall "Candidate Score Summary" scores, *see* Pl.'s Ex. 71, at FBI000192; Pl.'s Mem. in Opp'n 20, Caldwell was ranked second, *see* Pl.'s Ex. 71, at FBI000190.  And, while Little notes that Caldwell had served in a supervisory capacity for only 11 months compared to her three years, Pl.'s Mem. in Opp'n 21, she does not point to evidence suggesting that she had the type of "front-line" leadership experience for which the hiring committee was looking, *compare* Cole Dep. Tr. 54:17–22, *with id.* at 77:6–10 (drawing a distinction between "front-line supervisory" leadership and Little's role at the CIA).  Nor does she acknowledge that Caldwell was already occupying a formal GS-15 Unit Chief role at the FBI, *see* Pl.'s Ex. 71, at FBI000190, whereas she was, at best, operating in a functional GS-15 role at the CIA, *see* Pl.'s Little Dep. Tr. 28:1–10.  Once again, the record does not reflect a "stark superiority of credentials" from which the Court may infer pretext. *Porter*, 606 F.3d at 816 (citation modified).

The Court will thus grant summary judgment as to Little's discrimination claims regarding her non-selections.

## B.  Retaliation Claims

The Court next turns to Little's retaliation claims.  To state a retaliation claim under Title VII, a plaintiff first must plausibly allege that (1) "she engaged in statutorily protective activity"; (2) "she suffered a materially adverse action by her employer"; and (3) "the two are causally connected."  *Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 539 (D.C. Cir. 2024) (citation

modified).  If the plaintiff establishes that prima facie case, "the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citation modified).  As in the discrimination context, "[i]f the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence." *Id.* (citation modified).

Little asserts retaliation claims based upon Bravo's job revocation and her non-selections for the Human Resources, Counter-Terrorism, National Security, and EEO positions.  Because the government fails to assert a reason for the alleged negative job reference to Bravo, the Court analyzes the job revocation retaliation claim based on whether Little has established a prima facie case of retaliation.  *Figueroa*, 923 F.3d at 1087.  But because the government has asserted legitimate, nondiscriminatory reasons for its non-selections, the Court considers whether a reasonable jury could infer from "all available evidence" retaliation as to those non-selection decisions.  *See Bernanke*, 557 F.3d at 681.

None of Little's retaliation claims can survive summary judgment.  Little's statutorily protected activity occurred only *after* her job offer revocation and her non-selections for the Human Resources, Counter-Terrorism, and National Security Positions.  As such, it is impossible for a jury to infer a retaliatory link.  Likewise, Little has not proffered evidence to support a causal link between her non-selection for the EEO position and her protected activity that would allow a reasonable inference of retaliation. Therefore, the Court will grant summary judgment in favor of the government for each of the alleged retaliatory actions.

### 1.    Alleged Protected Activity

Little's retaliation claim is premised on two instances of alleged protected activity: (1) a question she posed about the prioritization of diversity and inclusion within the FBI to then–FBI

Director Christopher Wray at a meeting on May 14, 2019; and (2) the filing of her first EEO complaint on March 2, 2020. *See* Compl. ¶¶ 12–13, 35, 38, 136–48.[10]

While Little's EEO complaint constituted protected activity under Title VII, *see Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (plaintiff "engaged in statutorily protected activity by filing an EEO complaint"), her question to Director Wray is not entitled to the same protection. Although Title VII protects the act of making a charge or opposing a practice made unlawful by Title VII, *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015), not every complaint is protected activity, *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Indeed, "[w]hile no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Id.*

Little's question did not allege any such unlawful discrimination. Rather, her question reflects, at most, opposition to a general lack of diversity at the FBI. Such a complaint, standing alone, does not constitute protected activity. *See id.* ("[C]ommenting about absence of black

---

[10] In a "timeline" attached to her summary judgment briefing, Little identifies a series of additional actions that she asserts constitute "protected activity." Pl.'s Ex. 1 (Pl.'s Timeline), at 1–10, Dkt. 30-1. Little's complaint, however, makes no mention of these activities. With this timeline, therefore, Little seeks to add new retaliation claims in her opposition to summary judgment. *See, e.g.*, *Muse v. Wash. Metro. Area Trans. Auth.*, No. 23-cv-00407, 2024 WL 4792040, at *13–14 (D.D.C. Nov. 14, 2024) (finding that a plaintiff cannot "expan[d] her cited examples of protected activity" in opposition to summary judgment because "new claims cannot be pled in summary judgment briefs" (citation modified)), *aff'd* No. 24-cv-7191, 2025 WL 1677957 (D.C. Cir. June 12, 2025) (per curiam). As Little was represented by counsel when she filed her complaint, and in light of the "well established" rule that "a party may not amend its complaint or broaden its claims through summary judgment briefing," *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010); *see Manna v. DOJ*, 106 F. Supp. 3d 16, 19 (D.D.C. 2015); *Sai v. TSA*, 315 F. Supp. 3d 218, 234 (D.D.C. 2018), the Court limits its consideration to the alleged protected activity identified in Little's complaint, *see Muse*, 2024 WL 4792040, at *14 ("Because [the plaintiff] did not raise the alternative examples of protected activity in her amended complaint, they are not properly before the Court now [on summary judgment].)"; *see also Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 58 n.14 (D.D.C. 2015) (collecting cases rejecting plaintiffs' efforts to revise or broaden a complaint via an opposition to a motion for summary judgment).

employees, without alleging discrimination, was insufficient to qualify as protected activity." (citing *Pope v. ESA Servs.*, 406 F.3d 1001, 1010 (8th Cir. 2005))); *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 201 (D.D.C. 2012) ("[T]he plaintiffs must clearly complain about discriminatory treatment."); *see also Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 183 (S.D.N.Y. 2024) ("[T]he Second Circuit has held that complaints about a lack of diversity in an organization, *without any suggestion that lack of diversity is attributable to discriminatory conduct*, are not protected activity, because an employer is not required to engage in affirmative action efforts." (emphasis added)).

As such, the only protected activity upon which Little may base her retaliation claim is the March 2, 2020, filing of her first EEO complaint.

### 2. Bravo Job Offer Revocation and Non-Selections for the Human Resources, Counter-Terrorism, and National Security Positions

Little has not offered evidence to support a prima facie case of retaliation as to Bravo's job offer revocation or to allow an inference of retaliation as to her non-selections for the Human Resources, Counter-Terrorism, and National Security Positions. Little attributes Bravo's 2021 revocation of an employment offer to negative feedback that Odom communicated to Holt in 2019. *See* Compl. ¶ 46; *see* Pl.'s Mem. in Opp'n 27–34; Pl.'s Timeline 3. She was informed that she was not selected for the Human Resources Position on December 19, 2019; the Counter-Terrorism Position on December 19, 2019; and the National Security Position on January 28, 2020. Because each of these adverse employment actions occurred *before* Little's protected activity on March 2, 2020, no reasonable jury could infer that there was a causal connection between the two.[11] *See*

---

[11] To the extent that Little argues that her January 27, 2020, email correspondence with an EEO official was protected activity for which she faced retaliation, her retaliation claims as to the Human Resources, Counter-Terrorism, and National Security Positions nevertheless fail. Little's non-selections for the Human Resources and Counter-Terrorism Positions occurred in 2019, and

*Spence*, 109 F.4th at 539; *Whorton v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 351 (D.D.C. 2013) (no materially adverse actions taken before date of allegedly protected activity "could have been *because of* having engaged in protected activity").

### 3. Non-Selection for EEO Position

Little has also failed to allege a prima facie case of retaliation as to her non-selection for the EEO Position, as the record does not support a causal relationship between that non-selection and her protected activity. Little was notified that she was not selected for the EEO Position on April 21, 2021—nearly two years after she filed her first EEO complaint. Little does not identify any specific connection between that protected activity and her non-selection for the EEO Position, presumably asking the Court to infer a retaliatory motive based on temporal proximity. The Court cannot draw such an inference. The D.C. Circuit has instructed that, "[w]hen 'mere temporal proximity' is the only 'evidence of causality,' . . . 'the temporal proximity must be very close." *Spence*, 109 F.4th at 540 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam)). As such, the D.C. Circuit has "sometimes accept[ed] an adverse employment action occurring within three to four months of the protected activity as sufficient to allow an inference of causation," while holding that a ten-month gap between protected activity and adverse employment action is insufficient "to infer the necessary element of causation." *Id.*

Here, the nearly two-year gap between Little's protected activity and her non-selection for the EEO Position falls well outside of the "close" temporal proximity required to establish causality. Furthermore, once an employer produces a legitimate, nonretaliatory reason for an employment action, as the FBI has, "positive evidence beyond mere proximity is required to create

---

she has not alleged that any of the decisionmakers involved in her non-selection for the National Security Position were aware of her January 27 email correspondence.

a genuine issue of material fact concerning whether the motive for an adverse employment action was retaliation." *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015) (citation modified). As such, Little has failed to produce evidence that would allow a reasonable jury to infer retaliation as to her non-selection for the EEO Position, and her claim cannot survive summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants the defendant's Motion for Summary Judgment, Dkt. 28. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

January 13, 2026

28